157 So. 380

Succession of IPSER.

No. 31936.

Oct. 29, 1934.

Spearing & McClendon, of New Orleans, for John A. Ipser.

Dart & Dart, and Louis C. Guidry, all of New Orleans, for Mrs. Jennie Tallulah Stedman.

ODOM, Justice.

Jacob Ipser died on February 18, 1929, leaving a last will dated December 24, 1924, in which he bequeathed one-half of his estate to his brother John A. Ipser, who was named executor. The following property was inventoried as belonging to the community which existed between the deceased and his wife, Mrs. Lula Stedman Ipser; 76 shares of stock in various building and loan associations of the par value of $7,600; cash in bank, $1,094.88; 1 share of Pan American Life Insurance Company stock, appraised at $37; real estate appraised at $300; making a total of $9,031.88.

Mrs. Ipser, the widow, was present when the inventory was made, and claimed that all said property belonged to her individually and not to the community. She made protest against the action of the legatee under the will in putting this property down as belonging to the community. Her protest was overruled, and she subsequently brought proceedings to have the property decreed to be hers individually, and there was judgment in her favor. John A. Ipser, brother of the deceased and legatee under the will, appealed.

The sole question involved is whether the above-described property belonged to the community which existed between the deceased and his wife, or whether it was the separate property of the wife.

Jacob Ipser and Lula Stedman were married in the year 1909 and lived together under the community régime until the date of Mr. Ipser's death in 1929. Neither spouse brought any property into the marriage. All of the property found was acquired during the marriage, so that, at the dissolution of the community by the death of Mr. Ipser, all of the property, whether standing in the name of one or both of the spouses, is presumed to belong to the community, because the "period of time when the purchase is made is alone attended to, and not the person who made the purchase." Civ. Code art. 2402; Stauffer, MacReady & Co. v. Morgan, 39 La. Ann. 632, 2 So. 98; Otis v. Texas Co., 153 La. 384, 392, 96 So. 1, and cases cited.

Article 2405 of the Civil Code reads as follows:

"At the time of the dissolution of the marriage, all effects which both husband and wife reciprocally possess, are presumed common effects of gains, unless it be satisfactorily

proved which of such effects they brought in marriage, or which have been given them separately, or which they have respectively inherited."

All the property inventoried stands in the name of Mrs. Ipser. The shares of stock were issued to her and in her name, the real estate was in her name, and the cash in bank was deposited to her credit. Nevertheless it was incumbent upon her to show, in order to rebut the presumption of community, first, that the price paid for the property was her paraphernal funds; second, that it was administered by her; and, third, that the money was invested by her and, as to the cash on deposit in the bank, that it was acquired in such manner as to make it her separate property. Stauffer, MacReady & Co. v. Morgan and Otis v. Texas Co., supra.

In support of her contentions, Mrs. Ipser testified that during the period of her married life she had received gifts from relatives, proceeds of the sale of real estate donated to her, rentals therefrom, and dividends on stocks which she had acquired with her separate funds, amounting to more than $23,000, or about three times the value of the property inventoried as belonging to the community.

Her testimony on this point is criticized by counsel for John A. Ipser, legatee under the will; it being suggested that the amounts, or some of them at least, claimed to have been received by Mrs. Ipser are largely inflated. Possibly so, but she proved to our satisfaction that she did receive gifts, which became her separate property, sufficient to form the nucleus of an estate which through the years constantly yielded revenues which were re-invested by her, and that these, together with donations made to her by relatives from the date on which the couple were married on down to the date of the dissolution of the community, these being likewise invested by her, were altogether sufficient to enable her to accumulate the small estate which she now claims.

Mrs. Ipser's mother was a woman of some means. When her husband died, which was before Mrs. Ipser was married, she received from her husband's estate property valued at something over $40,000. Just what revenue she received from this property is not made clear. But Mrs. Ipser testified that her mother donated to her each month from October, 1909, to the date of her husband's death in 1929 the sum of $40. These donations alone amount to more than $9,000. The mother, who was at the time of the trial more than 80 years old, and who was afflicted, to some extent, with senility, testified that she had made donations to her daughter through all these years. But she was not sure that she had given her $40 each month Mrs. Ipser's two sisters testified that their mother had made such donations, but were not positive that they were made each month. Viewing the testimony on this point as a whole, we are satisfied that, while Mrs. Ipser may not have received $40 each month from her mother, she did receive altogether a considerable sum from that source.

The mother lived with Mr. and Mrs. Ipser a portion, but not all, of the time, and counsel suggests that the probabilities are that these amounts were paid for board and lodging. But this is only surmise, and finds no support in the record. John A. Ipser, the legatee,

and one other witness, testified that Jacob Ipser, the deceased, had told them that these amounts were paid for board. But their testimony to this effect, as well as their testimony that Jacob Ipser told them that all the property standing in Mrs. Ipser's name was purchased for the community, was pure hearsay and inadmissible for that reason. Besides, it is positively denied by Mrs. Ipser, and her testimony that the amounts contributed by her mother were in the nature of donations and not in payment of board is corroborated by her sisters.

The record discloses that on May 1, 1911, Mrs. Ipser's mother donated to her a house and lot on Camp street, which Mrs. Ipser sold on July 20, 1914, receiving net therefor $2,379.94. Counsel for the legatee concede that Mrs. Ipser is entitled to credit for this amount at least. This being true, it should be conceded also that Mrs. Ipser is entitled also to credit for the rental on this property received by her, amounting to $1,110, making a total of $3,489.94.

In addition to these amounts and the amounts which Mrs. Ipser received as donations from her mother, she received also the sum of $210 in gifts from one of her sisters, $500 from another sister, and $2,050.50 from her brother-in-law, Mr. Downing. Mrs. Ipser's testimony that she received these latter gifts is corroborated by her sisters and her brother-in-law. Mrs. Ipser testified that, as these funds came into her hands, she invested them in various stocks, and that she had received in the way of dividends on her homestead stock the sum of $960, and as dividends from common and preferred stock in the Chalin Drug Company and the Chalin-

Ipser Drug Company the sum of $2,877.20. It will thus be seen that as far back as 1914 Mrs. Ipser came into possession of funds amounting to $3,489.94, which admittedly became her separate property, to say nothing of other donations which she claims to have received. This amount, together with other donations, was invested by her in stocks, which admittedly paid dividends. She testified that she kept all these amounts separate and apart from the funds of the community, and that she invested and reinvested them all through the years. In this way she accounts for all of the property, including stocks, real estate, and cash in bank which stood in her name at the time the community was dissolved.

As to whether she invested and administered these funds and property personally, the testimony of Mrs. Ipser is clear that she did. There is no testimony at all to show that any of these funds or any of the property was ever under the control and administration of the husband.

Jacob Ipser drew salaries amounting all the way from $1,200 to $2,700 per year during the entire period of the marriage. It is suggested, but not proved, that he turned his entire salary over to his wife each month, and that the property was acquired with funds which she saved from that source. It is possible, but not at all probable, that Mrs. Ipser could have saved very much, if anything at all, from this source, even conceding that her husband turned over to her each month the major portion of his salary. In view of the fact that Mr. Ipser spent some money on himself and the fact that he had been able to purchase and pay for capital

stock in the Chalin-Ipser Drug Company of the par value of more than $16,000, which he owned at the time of his death, it is not reasonable to assume, as counsel suggest, that he turned over his entire salary each month to his wife. She testified that her husband gave her an allowance each month with which to pay rent and all household expenses. A portion of the time, she said, this allowance was $60 per month, then $80, and finally $110 per month, the amount varying according to the rent paid. While it is shown that she was frugal and did all the housework herself, yet it is not likely that she could have saved anything from this allowance.

It is suggested that, unless Jacob Ipser considered that this property belonged to the community, the making of the will bequeathing to his brother half of his estate was a vain and idle thing to do because, if this property belonged to his wife individually, he had no estate. This suggestion overlooks the fact that at the time he made the will in 1924 he owned stock in the Chalin-Ipser Drug Company of the par value of more than $16,000, and that at that time the drug company was prosperous and the stock worth par. Since the will was made in 1924, the drug company failed, and at the time of Mr. Ipser's death in 1929 was being liquidated, and the stock was apparently of no value.

The district judge found that all the property inventoried as belonging to the community was in fact the property of Mrs. Ipser individually. We think his judgment was correct, and we accordingly affirm it.

Judgment affirmed.